THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| DEFINITIVE HOLDINGS, LLC, a Utah limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>POWERTEQ LLC, a Delaware limited liability company,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER FINDING AS MOOT [218] DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON ITS AFFIRMATIVE DEFENSE, GRANTING [219] DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS**<br><br>Case No. 2:18-cv-00844-DBB-DBP<br><br>District Judge David Barlow |

Plaintiff Definitive Holdings, LLC ("Definitive") accuses Defendant Powerteq LLC ("Powerteq") of infringing U.S. Patent Number 8,458,689 ("'689 Patent").[1] On March 21, 2023, the court issued its claim construction on five disputed terms within the '689 Patent.[2] Now, Powerteq moves for summary judgment on Definitive's claims and its affirmative defense.[3]

---

[1] *See* Am. Compl. ¶¶ 19–62, ECF No. 8; *see* U.S. Patent No. 8,358,689 (filed Mar. 28, 2002) ("'689 Patent").

[2] *See* Mem. Decision and Order on [118] Plaintiff's and [119] Defendant's Mots. for Claim Construction ("Claim Construction Order"), ECF No. 189.

[3] Powerteq LLC's Mot. for Summ. J. Regarding its Eighth Affirmative Defense Based on Unpatentability Under 35 U.S.C. § 101 ("Def.'s Unpatentability Mot."), ECF No. 218; Powerteq LLC's Mot. for Summ. J. for: (1) Non-Infringement; (2) Invalidity under Pre-AIA 35 U.S.C. § 102(b); and (3) Invalidity Under the Enablement Requirement of Pre-AIA 35 U.S.C. § 112 ("Def.'s Infringement Mot."), ECF No. 219. Powerteq has requested oral argument on its motions. The court has found that oral argument would not materially assist the court, and it will decide the matter on the parties' briefing. *See* DUCivR 7-1(g).

# BACKGROUND

The application for the '689 Patent was filed on March 31, 2001.[4] In essence, the '689 Patent is designed to provide a simple and cost-effective way to alter the software in a vehicle's engine controller, which in turn can increase the performance of the engine.[5]

According to the specification, there are at least three aspects to the claimed invention. First, "[o]ne aspect of the invention provides methods for upgrading software in an engine controller[.]"[6] This occurs by "determining a version of the current software in the engine controller, identifying one or more data blocks of upgraded software associated with the current software and replacing one or more data blocks of the current software with the one or more data blocks of upgraded software."[7] Second, "[a]nother aspect of the invention provides an apparatus for upgrading software in an engine controller."[8] "The apparatus comprises[:] an interface configured to communicate data to and from the engine controller; a memory . . . ; and a processor."[9] In addition, "[t]he apparatus may comprise a user interface."[10] And third, "[a]nother aspect of the invention provides a machine readable medium carrying data."[11]

Claim 1 is illustrative of the first aspect.[12] It recites a method for "placing an engine controller reprogramming apparatus in data communication with the engine controller," "determining a version of current software in the engine controller," "identifying one or more

---

[4] *See* Pl.'s Third Am. Final Infringement Contentions 2, ECF No. 227-1.
[5] *See* '689 Patent col. 1 l. 23 to col. 2 l. 7.
[6] *Id.* col. 2 ll. 13–14.
[7] *Id.* col. 2 ll. 14–19.
[8] *Id.* col. 3 ll. 38–39.
[9] *Id.* col. 3 ll. 39–44.
[10] *Id.* col. 3 l. 52.
[11] *Id.* col. 4 ll. 4–5.
[12] *See id.* col. 12 ll. 23–61.

data blocks of upgraded software associated with the version of current software," and "replacing one or more data blocks of the current software with the one or more data blocks of upgraded software."[13] The method of replacing data itself involves "uploading from the engine controller to the engine controller reprogramming apparatus an image of the current software and storing the image of the current software [on] the engine controller reprogramming device," "creating a modified version of the current software at the engine controller reprogramming apparatus," "downloading . . . the modified version of the current software" from "the engine controller reprogramming apparatus into the engine controller," and "monitoring status information, and, if an interruption occurs, using the status information to resume replacing the one or more data blocks of the current software."[14]

Claim 27 is illustrative of the second aspect.[15] It recites an apparatus "comprising" an "interface," a "memory," and a "processor."[16] The processor is configured to implement the method recited in claim 1—namely, determining the current software, identifying data, replacing data.[17]

This court completed claim construction on March 21, 2023.[18] The court construed the following terms:

1. The term "upgrading software in an engine controller" means modifying the engine controller's version of current software by replacing one or more, but not all, data blocks of the current software to create a modified version of the current software.

---

[13] *Id.* col. 12 ll. 28–38.
[14] *Id.* col. 12 ll. 41–61.
[15] *See id.* col. 15 l. 34 to col. 16 l. 16.
[16] *Id.* col. 15 ll. 34–43.
[17] *Id.* col. 15 l. 42 to col. 16 l. 16.
[18] *See* Claim Construction Order.

Current software is the software existing at the engine controller at the time an
upgrade operation is initiated.

2. The term "status information / the status information" means data, which may
comprise a marker, stored on the apparatus during an upgrade or a restore operation,
that are consulted by the apparatus in the event of an interruption.

3. The term "interruption" means a stoppage.

4. The term "resume replacing" means continue the interrupted upgrade operation.

5. The term "use/using" means employ. The rest of the term "use/using the status
information to resume" is construed in accordance with parts 2 and 4[.][19]

Definitive alleges that Powerteq has infringed upon claims 1, 12, 21, 23, 27, 28, 31, and
32 of the '689 Patent.[20] Powerteq filed two motions for summary judgment on August 23,
2023.[21] Both its motions were fully briefed in October 2023.[22]

## STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact
and the movant is entitled to judgment as a matter of law."[23] "A fact is material if, under the
governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material

---

[19] *Id.* at 30–31.
[20] *See* Pl.'s Third Am. Final Infringement Contentions 1.
[21] *See* Def.'s Unpatentability Mot.; Def.'s Infringement Mot.
[22] *See* Definitive Holdings' Resp. to Powerteq's Mot. for Summ. J. (Unpatentability Under 35 U.S.C. § 101) ("Pl.'s Unpatentability Resp."), ECF No. 230; Definitive Holdings' Resp. to Powerteq's Summ. J. Mot. for: (1) Non-Infringement; (2) Invalidity under Pre-AIA 35 U.S.C. § 102(b); and (3) Invalidity under the Enablement Requirement of Pre-AIA 35 U.S.C. § 112 ("Pl.'s Infringement Resp."), ECF No. 232; Powerteq LLC's Reply in Support of Its Mot. for Summ. J. Regarding its Eighth Affirmative Defense Based on Unpatentability Under 35 U.S.C. § 101 ("Def.'s Unpatentability Reply"), ECF No. 235; Powerteq LLC's Reply in Support of its Mot. for Summ. J. for: (1) Non-Infringement; (2) Invalidity Under Pre-AIA 35 U.S.C. § 102(b); and (3) Invalidity Under the Enablement Requirement of Pre-AIA [35] U.S.C. § 112 ("Def.'s Infringement Reply"), ECF No. 236.
[23] Fed. R. Civ. P. 56(a).

fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented."[24] Where the moving party does not bear the ultimate burden of proof on an issue at trial, the party may simply point out to the court the lack of evidence to support the nonmoving party's case.[25] The burden then shifts to the nonmoving party to demonstrate that there is a genuine dispute of material fact for trial.[26] But when the moving party bears the ultimate burden of proof at trial, the party must make an initial showing sufficient to show that "no reasonable trier of fact could find other than for the moving party."[27]

## DISCUSSION

Powerteq makes four main arguments in its motions: First, that the '689 Patent is invalid because its claims are not novel[28]; second, that the '689 Patent is invalid because it claims only abstract ideas[29]; third, that the '689 Patent is invalid because it is not enabling[30]; and fourth, that Powerteq did not infringe the '689 Patent.[31]

## I.   Invalidity Under 35 U.S.C. § 102(b)

"A patent shall be presumed valid" and "[t]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity."[32] The Supreme

---

[24] *Doe v. Univ. of Denver*, 952 F.3d 1182, 1189 (10th Cir. 2020) (quoting *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015)).

[25] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

[26] *Id.* at 324.

[27] *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)).

[28] Def.'s Infringement Mot. 13–40.

[29] Def.'s Unpatentability Mot. 10–26.

[30] Def.'s Infringement Mot. 1–12.

[31] *Id.* 40–48.

[32] 35 U.S.C. § 282(a). This provision also requires that the affirmative defense of invalidity be pleaded. *Id.* § 282(b)(2). In its Answer, Powerteq included a defense that stated: "Each asserted claim in the '689 Patent is invalid for failure to comply with one or more of the requirements of the United States Code, Title 35, including" 35 U.S.C. §§ 101, 102. Answer 27.

Court has held that this means that patent defenses must be proved by clear and convincing evidence.[33] In addition, "[w]hen determing the validity of the claims of a patent, each claim must be separately considered: 'Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independent of the validity of other claims.'"[34]

"Even if an invention qualifies as a process, machine, manufacture, or composition of matter" under 35 U.S.C. § 101, it "must also satisfy 'the conditions and requirements [of Title 35],'" which "include that the invention be novel[.]"[35] Under 35 U.S.C. § 102,[36]

A person shall be entitled to a patent unless—

. . .

(b) the invention was patented or described in a printed publication in this or a foreign country *or in public use or on sale in this country*, more than one year prior to the date of the application for patent in the United States[.][37]

A patent claim is not novel—that is, it has been anticipated—"if each and every limitation is found in a single prior art reference."[38] Novelty is typically a question of fact.[39]

Powerteq argues that the '689 Patent is invalid because a device known as the Hypertech Power Programmer III ("PP3") anticipated the '689 Patent by several years.[40] Definitive

---

[33] *Microsoft Corp v. i4i Ltd. P'ship*, 564 U.S. 91, 100–103, 113–14 (2011).

[34] *Rosco, Inc. v. Mirror Lite Co.*, 304 F.3d 1373, 1379–80 (Fed. Cir. 2002) (quoting 35 U.S.C § 282) (emphasis removed).

[35] *Bilski v. Kappos*, 561 U.S. 593, 602 (2010).

[36] The parties agree that the court must apply the version of the statute existing prior to the Leahy-Smith America Invents Act. *See* Pub. L. No. 112-29, § 3(n), 125 Stat. 293 (2011).

[37] 35 U.S.C. § 102 (2011) (emphasis added).

[38] *OSRAM Sylvania, Inc. v. Am. Induction Techs., Inc.*, 701 F.3d 698, 704 (Fed. Cir. 2012); *accord, e.g.*, *Am. Calcar, Inc. v. Am. Honda Motor Co., Inc.*, 651 F.3d 1318, 1341 (Fed. Cir. 2011).

[39] *OSRAM Sylvania*, 701 F.3d at 704 (citing *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1319 (Fed. Cir. 2007)).

[40] Def.'s Infringement Mot. 13.

challenges the evidentiary underpinnings of Powerteq's argument and argues that the Hypertech device cannot have anticipated the '689 Patent because it did not disclose its inner workings.[41]

## A.  Evidentiary Objections

Definitive "does not dispute" Powerteq's statement of undisputed material facts on this question, though it does object that those facts are based on inadmissible evidence.[42] Federal Rule of Civil Procedure 56 provides that "[a] party may object that the material cited to support or dispute a fact *cannot* be presented in form that would be admissible in evidence."[43] "The requirement is that the party submitting the evidence show that it will be possible to put the information, the substance or content of the evidence, into an admissible form."[44] In addition, Rule 56 also states that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters cited."[45]

Here, Powerteq presents a statement of material facts that is largely based on the deposition testimony of Mr. Ramsey and a declaration from a purported expert, Mr. Brogioli.[46] Mr. Ramsey testified that Hypertech was based in the United States and that it sold PP3 units in

---

[41] Pl.'s Infringement Resp. 9.
[42] *Id.* at 9.
[43] Fed. R. Civ. P. 56(c)(2) (emphasis added).
[44] *Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016) (quoting 11 James Wm. Moore et al., Moore's Federal Practice § 56.91 (3d ed. 2015)).
[45] Fed. R. Civ. P. 56(c)(4).
[46] Def.'s Infringement Mot. 14–19; *see* Dep. of Jay Ramsey ("Ramsey Dep."), ECF No. 240-1; Decl. of Michael C. Brogioli, Ph.D. in Support of Powerteq's Motions for Summ. J. of Invalidity of the Asserted Claims of U.S. Patent No. 8,458,689; Summ. J. of Non-Infringement; and Summ. J. Regarding Lack of Enablement ("Brogioli Decl."), ECF No. 224.

the United States beginning in 1994.[47] And both Mr. Ramsey and Mr. Brogioli discussed the

functionality of the PP3.[48]

### 1.   Ramsey Testimony

Definitive objects that Mr. Ramsey's testimony lacks foundation and is based on

inadmissible hearsay.[49]

Under Federal Rule of Evidence 602, "[a] witness may testify to a matter only if evidence

is introduced sufficient to support a finding that the witness has personal knowledge of the

matter."[50] Definitive suggests that "[s]imply because Hypertech designated Mr. Ramsey as its

Rule 30(b)(6) representative does not mean he is exempt from the personal knowledge

requirement."[51] Rule 30(b)(6) requires that a designated representative of an entity "testify about

information known or reasonably available to the organization."[52]

The text of Rule 30(b)(6) itself forecloses Definitive's argument. Indeed, the purpose and

function of Rule 30(b)(6) would be destroyed were it true that a corporate representative's

testimony was confined to matters within the representative's personal knowledge. And while

the Tenth Circuit has only briefly engaged with this issue in dicta and in an unpublished

---

[47] Ramsey Dep. Ramsey Dep. 11:11–12:12, 13:18–13:21, 14:13–14:20, 46:14–46:15.
[48] *See infra* Section I.B.3.
[49] Pl.'s Infringement Resp. 10–13.
[50] Fed. R. Evid. 602.
[51] Pl.'s Infringement Resp. 10.
[52] Fed. R. Civ. P. 30(b)(6).

opinion,[53] other circuits have more directly confronted and rejected the argument raised by Definitive.[54]

Definitive cites to a number of cases in support of its argument. Primarily, it suggests that in *HealthBanc International, Inc. v. Synergy Worldwide, Inc.*,[55] this court held that a 30(b)(6) witness must have personal knowledge.[56] To the contrary, the *HealthBanc* court was faced with a question as to the interaction of Rules 30(b)(6) and 56(c)(4) when a declaration from a 30(b)(6) representative was submitted on summary judgment.[57] That is not the situation here, contrary to Definitive's suggestion; because Poweteq seeks to use Mr. Ramsey's deposition testimony, not a declaration or affidavit, Rule 56(c)(4) is inapplicable. The other cases cited by Definitive are inapposite and unpersuasive.[58]

---

[53] *See Ecclesiastes 9:10-11-12, Inc. v. LMC Holding Co.*, 497 F.3d 1135, 1146 (10th Cir. 2007) (addressing the argument that a plaintiff was not required to make Rule 30(b)(6) designations because it lacked control over potential designees, and quoting a law review article for the proposition that corporations designate individuals who lack personal knowledge but who otherwise have been educated about it); *Sidlo v. Millercoors, LLC*, 718 F.App'x 718, 729 n.11 (rejecting the argument that because a 30(b)(6) deponent's testimony was second hand it lacked credibility).

[54] *See, e.g.*, *PPM Fin., Inc. v. Norandal USA, Inc.*, 392 F.3d 889, 894–95 (7th Cir. 2004) ("[A witness] was designated as a witness under [Rule 30(b)(6)], which authorized him to testify not only to matters within his personal knowledge but also to 'matters known or reasonably available to the organization.' Thus, [the witness] was free to testify to matters outside his personal knowledge as long as they were within the corporate rubric." (quoting *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 627 n.7 (7th Cir. 2001))); *Cutting Unterwater Techs. USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512, 516 (5th Cir. 2012) (mem.); *Bruno v. Greene Cnty. Schs.*, 801 F.App'x 681, 685 n.2 (11th Cir. 2020); *see also Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 433 (5th Cir. 2006) (holding a party "violated rule 30(b)(6) by failing to prepare" a witness "with respect to issues that although not within his personal knowledge, were within the corporate knowledge of the organization"); *Virginia Dep't of Corr. v. Jordan*, 921 F.3d 180, 193 (4th Cir. 2019) ("Rule 30(b)(6) deponents testify on behalf of entities, not themselves, and often do so based on careful advance preparation, not personal knowledge."); 8A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2103 (3d ed., April 2023 Update).

[55] No. 2:16-cv-00135-NJP-PMW, 2019 WL 3500896 (D. Utah Aug. 1, 2019).

[56] Pl.'s Infringement Resp. 10–11.

[57] 2019 WL 3500896, at *12–13.

[58] *See* Pl.'s Infringement Resp. 11–12 (citing *Deutsche Shell Tanker Gesellschaft mbH v. Placid Refining Co.*, 993 F.2d 466, 473 n.29 (5th Cir. 1993); *Union Pump Co. v. Centrifugal Tech. Inc.*, 404 F.App'x 899, 907–09 (5th Cir. 2010)).

Thus, contrary to Definitive's arguments, it is immaterial that Mr. Ramsey joined Hypertech years after the company stopped selling the device or that no engineers who worked on the device still work for Hypertech today.[59] While those arguments may go to the weight of Mr. Ramsey's testimony, they do not affect its admissibility. This is especially the case, when, as Powerteq points out, Mr. Ramsey plainly took steps to ensure that he was prepared to discuss the device.[60]

### 2.   Hypertech Source Code

Definitive argues that the Hypertech source code is inadmissible hearsay, as the business records exception to the rule against hearsay is inapplicable.[61] Definitive does not, however, engage with the threshold question of whether programming code is hearsay in the first place, nor does it point to any specific portions of the record to suggest what would be inadmissible.

Under Federal Rule of Evidence 802, hearsay is generally inadmissible, unless an exception or exemption applies.[62] "Hearsay" is an out of court statement used to prove the truth of the matter asserted in the statement.[63] A "statement" is "a person's oral assertion, written assertion, or nonverbal conduct, if the person intends it as an assertion."[64] And while "[t]he term 'assertion' is not defined in Rule 801," it generally means "to state or declare positively" or "to demonstrate the existence of."[65] The Advisory Committee Notes clarify that "nothing is an

---

[59] *Cf.* Pl.'s Infringement Resp. 12.
[60] *See* Ramsey Dep. 11:7–11:13, 17:22–18:2, 20:14–20:20: 23:12–23:18, 53:23–54:5.
[61] Pl.'s Infringement Resp. 13–14.
[62] Fed. R. Evid. 802.
[63] Fed. R. Evid. 801(c).
[64] Fed. R. Evid. 801(a).
[65] *United States v. Summers*, 414 F.3d 1287, 1299 (10th Cir. 2005) (quoting Webster's Ninth New Collegiate Dictionary 109 (1991)).

assertion unless it is intended to be one."[66] Typically, questions and commands are not hearsay because they cannot be construed as an assertion and because they are not capable of asserting a truth.[67] In addition, machine-generated information is not hearsay when it is accomplished without human input since it is not a statement and does not have a declarant.[68]

Throughout his declaration, Mr. Brogioli relies on the Hypertech device's source code.[69] However, to the extent that Mr. Brogioli relies on code that merely describes computer commands, there is no hearsay problem, since the code is not a statement. However, to the extent that Mr. Brogioli relies on descriptions within the code, those statements would fall within the definition of hearsay.[70]

The next question is whether, to the extent they contain hearsay, the code and the descriptions within the code are covered by an exception. Under Federal Rule of Evidence 803(6), business records are not excluded from the rule against hearsay when:

> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business . . . ;
>
> (C) making the record was a regular practice of that activity; [and]
>
> (D) all of these conditions are shown by the testimony of the custodian or other qualified witness[.]"[71]

---

[66] Fed. R. Evid. 801, advisory committee's note to 1972 amendment.
[67] *See United States v. Jackson*, 88 F.3d 845, 848 (10th Cir. 1996); 30B Wright & Miller, *supra* note 54, at § 6726. *But see Summers*, 414 F.3d at 1299–1300 (holding questions can include assertions contained within, if intended by the declarant).
[68] *United States v. Hamilton*, 413 F.3d 1138, 1142–43 (10th Cir. 2005).
[69] *See* Brogioli Decl. ¶¶ 69–198; *see also id.* Exh. E.
[70] *See* Brogioli Decl. ¶¶ 88, 91, 109.
[71] *See* Fed. R. Evid. 803(6).

Definitive primarily argues that Mr. Ramsey is not a custodian or other qualified witness, given that he was not at Hypertech at the time the device was created, and had to rely on another employee to pull records for him.[72] Even assuming that Mr. Ramsey was not a custodian or other qualified witness, this objection fails. The standard under Rule 56(c) is whether it would be impossible for the evidence to be admitted at trial. So even if Mr. Ramsey himself could not properly authenticate the code or the notes within the code, another employee at Hypertech who was charged with maintaining records would be able to make such a showing. And Mr. Ramsey's testimony suggests that the remaining elements would be satisfied.[73] Definitive has not carried its burden in demonstrating under Rule 56(c) that the source code "cannot" be presented in an admissible form at trial.

Because both of Definitive's evidentiary objections are without merit, the court turns to whether the Hypertech PP3 anticipated the '689 Patent.

### B.    Legal Effect of the Hypertech Device

Powerteq argues that the Hypertech device is anticipatory prior art because it was on sale and in public use more than one year in advance of Definitive's patent application.[74] Definitive makes several arguments to the contrary, namely that Hypertech abandoned or concealed its invention and that the Hypertech device is not prior art because its functionality was never disclosed.[75]

---

[72] *See* Pl.'s Infringement Resp. 13–14.
[73] *See* Ramsey Dep. 15: 13–18:15.
[74] Def.'s Infringement Mot. 13–40.
[75] Pl.'s Infringement Resp. 15–31.

### 1. Abandonment

Definitive argues that 35 U.S.C. § 102(g) is relevant to the inquiry under 35 U.S.C.

§ 102(b).[76] Powerteq, however, points out that this argument was based on a misquotation of

*Checkpoint Systems, Inc. v. U.S. International Trade Commission*.[77]

35 U.S.C. § 102(g)(2) provides that "[a] person shall be entitled to a patent unless . . .

before the applicant's invention thereof the invention was made in this country by another person

who had not abandoned, suppressed or concealed it."[78] But "[t]he inquiry into a section 102(b)

public use proceeds independent of the inquiry into a section 102(g) abandonment."[79] Indeed,

"'[n]otwithstanding abandonment of the prior use—which may preclude a challenge under

section 102(g)—prior knowledge or use by others may invalidate a patent under section102(a) if

the prior knowledge or use was accessible to the public.' Similarly, third party prior use

accessible to the public is a section 102(b) bar."[80] Accordingly, whether or not Hypertech

abandoned its use is irrelevant to the issue at hand.

### 2. Prior Sale Doctrine

Definitive argues that even assuming that the Hypertech device includes all the elements

claimed in the '689 Patent and was on sale prior to one year before the '689 Patent's application,

the Hypertech device does not invalidate the '689 Patent because "Powerteq has offered no

evidence that the Hypertech device *disclosed* all the elements of the asserted claims."[81] Powerteq

---

[76] *Id.* 22–24.
[77] 54 F.3d 756, 762 (Fed. Cir. 1995). Counsel for Definitive proffers that the error was unintentional. *See* ECF No. 238. However, there is no suggestion that Definitive has withdrawn this argument.
[78] 35 U.S.C. § 102(g) (2011).
[79] *Eolas Techs., Inc. v. Microsoft Corp.*, 399 F.3d 1325, 1333 (Fed. Cir. 2005).
[80] *Id.* (quoting *Woodland Tr. v. Flowertree Nursery*, 148 F.3d 1358, 1370 (Fed. Cir. 1998)).
[81] Pl.'s Infringement Resp. 20; *see id.* 21–22, 24–27.

replies that the prior use and prior sale rule does not require that the components of an invention be disclosed.[82] Unfortunately, there is a lack of analytical clarity on how Section 102(b) is to be applied.[83]

The Supreme Court has stated that "the on-sale bar applies when two conditions are satisfied before the critical date. First, the product must be the subject of a commercial offer or sale. . . . Second, the invention must be ready for patenting."[84] The second condition "may be satisfied in at least two ways: by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention."[85] Actual reduction to practice requires both an embodiment that met all the limitations of the claims and that the invention work for its intended purpose.[86] And while it may be true that "[t]he overriding concern of the on-sale bar is an inventor's attempt to commercialize his invention beyond the statutory term,"[87] a review of the relevant caselaw makes clear that third party sales of a product identical to the claimed invention will trigger the Section 102(b) bar. Indeed, "the question is not whether the sale, even a third party sale, 'discloses' the invention at the time of sale, but whether the sale relates to a device that *embodies* the invention."[88] Thus, there have been cases in which the third-party sale of an unpatented product

---

[82] Def.'s Infringement Reply 13–17.
[83] *See generally* R. Carl Moy, <u>Moy's Walker on Patents</u> § 8:21 (4th ed., Nov. 2023 Update).
[84] *Pfaff v. Wells Electronics, Inc.*, 525 U.S. 55, 67 (1998).
[85] *Id.* at 67–68.
[86] *E.I. du Pont de Nemours & Co. v. Unifrax I LLC*, 921 F.3d 1060, 1075 (Fed. Cir. 2019).
[87] *Netscape Comms. Corp. v. Konrad*, 295 F.3d 1315, 1323 (Fed. Cir. 2002).
[88] *J.A. LaPorte, Inc. v. Norfolk Dredging Co.*, 787 F.2d 1577, 1583 (Fed. Cir. 1986); *accord, e.g., In re Epstein*, 32 F.3d 1559, 1567–68 (Fed. Cir. 1994); *Zenith Electronics Corp. v. PDI Commc'n Sys., Inc.*, 522 F.3d 1348, 1356–57 (Fed. Cir. 2008).

of a secret patented method have not triggered the Section 102(b) bar,[89] just as there have been

cases in which the third-party sale of a product identical to the claimed product have triggered

the Section 102(b) bar.[90] And the latter group of cases applies even when the public is unaware

"that the product sold actually embodies the claimed invention."[91] Finally, when "a product and

methods of using that product . . . 'approach each other so nearly that it [is] difficult to

distinguish the process from the function of the apparatus . . . ., a sale of the product is

tantamount to a sale of the process performed by that product and thus creates an on-sale bar to

the process claims as well."[92]

   In arguing that the Hypertech PP3 is not prior art, Definitive stresses that if the PP3 can

be anticipatory under Section 102(b) absent "disclosure of the inner workings" of the device, the

purposes of the patent system—public disclosure—will be frustrated.[93] This argument is

meritless. First, the court is bound by the Federal Circuit's interpretation of Section 102(b),

which is that disclosure is not required under the prior sale doctrine. And second, while it is true

that "one of the purposes of the patent system is to encourage dissemination of information

concerning discoveries and inventions,"[94] it is equally true that "no patent should be granted

which withdraws from the public domain technology already available to the public."[95] That the

---

[89] *In re Caveney*, 761 F.2d 671, 675–76 (Fed. Cir. 1985); *see, e.g.*, *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1549–50 (Fed. Cir. 1983).

[90] *Abbott Lab'ys v. Geneva Pharms., Inc.*, 182 F.3d 1315, 1317, 1319 (Fed. Cir. 1999); *cf. BASF Corp. v. SNF Holding Co.*, 955 F.3d 958, 969–71 (Fed. Cir. 2020) (holding "there was no product sold as part of the transaction that embodied the essential features" of a process identical to the claimed invention).

[91] *Helsinn Healthcare S.A. v. Teva Pharma. USA, Inc.*, 855 F.3d 1356, 1370–71 (Fed. Cir. 2017), *aff'd* 586 U.S. 123.

[92] *BASF*, 955 F.3d at 970.

[93] *See* Pl.'s Infringement Resp. 30; *see also id.* at 24–31.

[94] *Brenner v. Manson*, 383 U.S. 519, 533 (1966).

[95] *Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1454 (Fed. Cir. 1984); *accord BASF*, 955 F.3d at 968 ("The primary reasons for the statutory bars are to prevent the public from being deprived of that which it has come to rely on as publicly available, to encourage prompt disclosure of inventions, and to prevent effective extension of patent term by gamesmanship.").

PP3 can qualify as anticipatory despite not disclosing its inner workings is entirely consistent with the purpose of the Section 102(b) bar.

### 3.    Application of the Prior Sale Doctrine to the Hypertech Device

There is no genuine dispute of material fact that the Hypertech PP3 was the subject of a commercial offer for sale more than one year before the critical date. Mr. Ramsey testified as to sales of the PP3 made in the United States between 1994 and 2001,[96] and Definitive has made no effort to dispute these facts. These actual sales satisfy the first element required to trigger the Section 102(b) bar. In addition, there is no dispute that the critical date for the '689 Patent is March 30, 2000,[97] so there is no dispute that the PP3 was on sale before the critical date.

The court turns then to whether the PP3 fully embodies the '689 Patent. Powerteq argues that the PP3 embodies each of the elements of claims 1, 12, 21, 23, 27, 28, 31, and 32 of the '689 Patent[98]—*i.e.*, each of the claims Definitive alleges Powerteq to have infringed. In support of this argument, Powerteq presented a list of facts derived from Mr. Ramsey's and Mr. Brogioli's testimony.[99] Definitive stated that it "does not dispute any of Powerteq's alleged undisputed facts[.]"[100] And indeed, Definitive does not suggest that any of the limits contained in the '689 Patent are not embodied by the Hypertech device. The court considers each in turn.

---

[96] Ramsey Dep. 11:11–12:12, 13:18–13:21, 14:13–14:20.
[97] *See* Def.'s Infringement Mot. 20; Pl.'s Infringement Resp. 15; *see also* '689 Patent (provisional application filed on March 30, 2001).
[98] Def.'s Infringement Mot. 20–27.
[99] *See id.* 14–19.
[100] Pl.'s Infringement Resp. 9.

i.       **Claim 1**

Claim 1 has four general components. First, claim 1 of the '689 Patent requires that the reprogramming apparatus is placed in communication with the engine controller.[101] Mr. Ramsey testified that the PP3 was plugged into the engine controller via the on-board diagnostic port.[102] Likewise, Mr. Brogioli declares that the PP3 electronically connects to an engine control unit in order to initiate communications.[103]

Second, claim 1 of the '689 Patent requires that the reprogramming apparatus determine the current software in the engine controller, and that it request from the engine controller and store "a first identification number."[104] Mr. Ramsey testified that the PP3 operated by identifying the "stock program" in the vehicle by identifying the VIN.[105] Mr. Brogioli confirmed this understanding.[106]

Third, claim 1 of the '689 Patent requires that the reprogramming apparatus identify data blocks of upgraded software associated with the current software.[107] Mr. Ramsey testified that the PP3 downloaded code from the vehicle and that the PP3 enabled users to select the variables to be changed.[108] Mr. Brogioli confirmed this.[109]

Fourth, claim 1 of the '689 Patent requires that the reprogramming apparatus replace data blocks in the current software with data blocks in the upgraded software.[110] This step itself

---

[101] '689 Patent col. 12 ll. 23–27.
[102] Ramsey Dep. 28:16–29:9.
[103] Brogioli Decl. ¶¶ 77–78.
[104] '689 Patent col. 12 ll. 28–32.
[105] Ramsey Dep. 29:15–30:22.
[106] Brogioli Decl. ¶¶ 86–89.
[107] '689 Patent col. 12 ll. 33–36.
[108] Ramsey Dep. 30:24–31:12.
[109] Brogioli Decl. ¶¶ 95–96.
[110] '689 Patent col. 12 ll. 37–38.

consists of several sub-steps: uploading an image of the current software to the reprogramming device, creating a modified version of the current software, downloading the modified version to the engine controller, and monitoring for an interruption.[111] Mr. Ramsey discussed how the PP3 would "download . . . the factory program, stock program, if you will, first and retain that in the memory of . . . the programmer[.]"[112] From there, the user "semi-customizes the . . . file that the Power Programmer would send back to the car."[113] Mr. Brogioli confirmed that the PP3 anticipates these first three steps.[114] Next, Mr. Ramsey testified that if the PP3 loses communication with the engine controller, "it stops trying to communicate with the car at that time until the vehicle is reconnected. Then [it] will begin to run again."[115] Mr. Brogioli confirmed that this process anticipated the monitoring step.[116] Accordingly, the court finds that the PP3 embodies each of the claim limitations in claim 1 of the '689 Patent.

### ii.    Claim 12

Claim 12 reads:

> A method according to claim 1, comprising, subsequent to replacing the one or more data blocks of the current software, restoring the current software by downloading the unaltered image of the current software from the memory of the engine controller reprogramming apparatus back into the engine controller.[117]

Mr. Ramsey testified that the PP3 would download the stock program before making any alterations in order to preserve the code in case the original code needed to be restored.[118]

---

[111] *Id.* col. 12 ll. 39–61.
[112] Ramsey Dep. 25:19–26:6.
[113] *Id.* 26:6–26:8; *see also id.* 27:13–27:18 ("Q: So the Power Programmer III would swap certain values in the stock software? A: Yes. Q: And then it would take that software and put it back in the car? A: Yes.").
[114] *See* Brogioli Decl. ¶¶ 102–04, 108–10, 117–20.
[115] Ramsey Dep. 34:14–34:19.
[116] Brogioli Decl. ¶¶ 129–33.
[117] '689 Patent col. 13 ll. 52–57.
[118] Ramsey Dep. 26:9–27:2.

Likewise, Mr. Brogioli declared that the PP3 contained code that enabled it to save and restore the original software.[119] Accordingly, this claim was anticipated.

### iii.    Claim 21

Claim 21 has four general components. First, claim 21 requires that the reprogramming apparatus be provided with "information identifying a plurality of software versions and one or more blocks of upgraded software associated with each of the plurality of software versions."[120] Mr. Ramsey testified that the PP3 operated by downloading code for different car models off the Hypertech server and he alluded to the creation and download into the PP3 of updated software.[121] Mr. Brogioli also discusses how the PP3 came pre-loaded with updated software.[122]

Second, claim 21 requires that the reprogramming apparatus determine "a version of current software in the engine controller," request "a first identification number from the engine controller," and store that number in the reprogramming apparatus.[123] This is identical to the process disclosed in claim 1, and as such, was anticipated by the PP3.[124]

Third, claim 21 requires that the reprogramming apparatus identify, "from within the information, one or more blocks of upgraded software associated with the version of the current software."[125] The only material difference between this limit and the limit contained in claim 1 is the phrase "from within the information."[126] The court concludes that this limit is anticipated as

---

[119] Brogioli Decl. ¶¶ 140–41.
[120] '689 Patent col. 14 ll. 30–34.
[121] Ramsey Dep. 28:2–28:15, 29:24–30:20, 30:23–31:12.
[122] *See* Brogioli Decl. ¶¶ 95–96.
[123] '689 Patent col. 14 ll. 35–40.
[124] *See supra* notes 105–106 and accompanying text.
[125] '689 Patent col. 14 ll. 41–43.
[126] *See supra* notes 107–109 and accompanying text.

well, since the PP3 could be loaded with updated code for different car models and was programmed to permit the user to select variables to change.[127]

And fourth, claim 21 requires that the reprogramming apparatus replace current software with upgraded software.[128] The only material difference between this limit, and the limit contained in claim 1 discussed above,[129] is that the "downloading" is more detailed:

> downloading from the engine controller reprogramming apparatus to the engine controller a data stream comprising the modified version of the current software *the data stream obtained by modifying the image of the current software at the engine controller by replacing the one or more blocks of upgraded software according to the information while retaining as part of the modified version at least some data from the image while retaining the uploaded image of the current software in the memory of the engine controller reprogramming apparatus for restoration.*[130]

But the additional limits in the downloading step merely repeat other limits disclosed in claims 1 and 12.[131] Accordingly, claim 21 is anticipated.

### iv.    Claim 23

Claim 23 provides for "[a] method according to claim 21, wherein, for each of the plurality of versions, the information comprises locations for insertion of one or more blocks of upgraded software."[132] As discussed above, the data loaded onto the PP3 included information specifying which portions of code would need to be modified in order to achieve the correct software upgrade.[133] Accordingly, claim 23 is anticipated.

---

[127] *See supra* notes 121–122; Ramsey Dep. 31:6–31:12.
[128] '689 Patent col. 14 l. 44 to col. 15 l. 5.
[129] *See supra* notes 110–111 and accompanying text.
[130] '689 Patent col. 14 ll. 56–67 (emphasis added); *see id.* col. 12 ll. 54 – 58 ("downloading a data stream from the engine controller reprogramming apparatus into the engine controller, the data stream comprising the modified version of the current software including the one or more data blocks of upgraded software").
[131] *See supra* notes 110–119.
[132] '689 Patent col. 15 ll. 10–12.
[133] *See* Ramsey Dep. 31:6–31:12; Brogioli Decl. ¶¶ 95–96, 118–119.

> **v.      Claim 27**

Claim 27 is an independent claim for "[a]n apparatus for upgrading software in an engine controller" which comprises: "an interface configured to communicate data to and from the engine controller"; "a memory" to store software versions; and "a processor in communication with the memory and the interface."[134] The processor itself is configured to apply each limit from claim 1.[135] As discussed above, the limits from claim 1 were anticipated.[136] Likewise, the court concludes that since Mr. Ramsey and Mr. Brogioli testified as to the connection between the PP3 and the engine controller, the interface limitation is anticipated.[137] Next, because the record indicates that different versions of software could be loaded onto the PP3 and that the PP3 would download the current software from the engine controller,[138] it is clear that the PP3 had a memory. And finally, since the record indicates that the PP3 itself performed the upgrades to the software,[139] it is clear that the PP3 had a processor. Thus, claim 27 is anticipated.

> **vi.      Claim 28**

Claim 28 recites "[a]n apparatus according to claim 27, wherein the memory also stores information about a location for insertion of each data block of upgraded software into its associated software version."[140] As discussed above, it is clear that the PP3 had a memory and that the memory stored data specifying the portions of code to be modified.[141] Therefore, this claim is anticipated.

---

[134] '689 Patent col. 15 ll. 34–42.
[135] *See id.* col 15 l. 42 to col. 16 l. 17.
[136] *See supra* notes 101–116 and accompanying text.
[137] *See* Ramsey Dep. 28:16–29:9; Brogioli Decl. ¶¶ 77–78.
[138] *See* sources cited *supra* notes 112–116, 121–122.
[139] *See* sources cited *supra* notes 107–116.
[140] '689 Patent col. 16 ll. 17–21.
[141] *See supra* notes 133, 138 and accompanying text.

### vii.    Claim 31

Claim 31 recites "[a]n apparatus according to claim 27, wherein the processor is configured to restore the current software by downloading the unaltered image of the current software from the memory of the apparatus into the engine controller."[142] The record establishes that the PP3 could restore the original software that it downloaded from the car.[143] Accordingly, this claim is anticipated.

### viii.   Claim 32

Finally, claim 32, provides that the apparatus recited in claim 31 comprises a user interface that has at least one of:

(a) an output for indicating whether the version of the current software in the engine controller corresponds with one of the plurality of software versions identified in the information;

(b) an output for indicating whether the image of the current software stored in the memory matches the current software in the engine controller;

(c) an output for indicating an error in communication with the engine controller;

(d) an output for indicating a low operating voltage;

(e) an output for indicating a failure to recognize hardware associated with the engine controller;

(f) an output for indicating an error erasing data from the engine controller; and

(g) an output for indicating an attempt to upgrade software that has already been upgraded.[144]

---

[142] '689 Patent col. 16 ll. 30–34.
[143] *See* sources cited *supra* notes 118–119.
[144] '689 Patent col. 16 ll. 34–52.

22

Powerteq suggests that because the claim includes the phrase "at least one of," the claim recites a disjunctive list,[145] meaning that the PP3 will fully embody claim 32 of the '689 Patent if it performs even one of the seven enumerated functions. The court agrees.

First, the PP3 includes a user interface. Mr. Brogioli makes that declaration and presents two images of the PP3 in support of this fact.[146] Second, the court finds that the PP3 embodies at least four of the enumerated functions. Namely, relying on the PP3's manual, Mr. Brogioli declares that the PP3 "user interface indicated what version of the current software in the engine controller corresponded with one of the software versions" and that it "also indicated whether the software stored in its memory matched what was currently on the engine controller."[147] Next, he declares that the PP3 "could indicate if there was an error in communication with the engine control unit."[148] In support, Mr. Brogioli points to portions of the PP3's manual that show an error prompt that will appear on the user interface of the PP3 in the event of an error in communication.[149] In addition, Mr. Brogioli declares that the PP3 "could indicate if it did not recognize the vehicle it was connected to."[150] In support, Mr. Brogioli presents a section of the manual that suggests that an error will appear on the user interface if the vehicle has an unknown factory program.[151] And finally, Mr. Brogioli declares that the PP3 "could alert the user if the user was trying to upgrade software that was already upgraded."[152] In support, Mr. Brogioli points to evidence from the manual suggesting that the user interface would show a prompt that

---

[145] Def.'s Infringement Mot. 29.
[146] *See* Brogioli Decl. ¶ 190.
[147] *Id.* ¶¶ 191, 192.
[148] *Id.* ¶ 193.
[149] *Id.*
[150] *Id.* ¶ 195.
[151] *Id.*
[152] *Id.* ¶ 197.

read "HYPERTECH TUNING IS INSTALLED" and giving the user the option to return to stock programming.[153] Accordingly, given that several functions of the user interface identified by claim 32 could be performed by the PP3, the court finds that claim 32 is anticipated.

In sum, the court finds that Powerteq has carried its burden of proving invalidity under Section 102(b). No reasonable jury could hold other than for Powerteq based on the record before the court. Indeed, it is significant that Definitive did not dispute any of the facts identified by Powerteq in support of its motion, let alone argue that the facts presented did not suffice to establish that the PP3 fully embodied the claims at issue from the '689 Patent. Accordingly, summary judgment for Powerteq is appropriate, and the court need not reach the remaining issues.

## ORDER

For the forgoing reasons, the court GRANTS Defendant's motion for summary judgment.[154] Claims 1, 12, 21, 23, 27, 28, 31, and 32 of U.S. Patent Number 8,458,689 are INVALID under 35 U.S.C. § 102(b). Defendant's motion for summary judgment regarding its affirmative defense for unpatentability is MOOT.[155]

Signed April 25, 2024.

BY THE COURT

_____
David Barlow
United States District Judge

---

[153] *Id.*
[154] ECF No. 219.
[155] ECF No. 218.